# H. F. MANDLER COMPANY *v.* LEWIS.

---

### PLEADING; VARIANCE; EXCHANGE.

Where, in a action to recover a balance claimed to be due, the plaintiff from the defendants on an exchange of properties, the plaintiff claimed in her declaration that under a change of the original con-

traut of exchange, which change had been agreed upon by herself and
the defendants, the transaction was to have been consummated so
as to entitle her to the balance claimed, but her evidence showed that
the change contemplated was abandoned, as indicated by her act in
carrying out the transaction in accordance with the original contract,
the effect of which was to leave no balance due her, it was *held* that
the trial court erred in overruling a motion by the defendants to
direct a verdict in their favor, on the ground that there was a fatal
variance between the plaintiff's allegations and proof.

No. 2747.   Submitted February 3, 1915.   Decided March 1, 1915.

HEARING on an appeal by the defendants from a judgment
of the Supreme Court of the District of Columbia, on verdict,
in an action to recover damages for the alleged breach of con-
tract.                                              *Reversed.*

The COURT in the opinion stated the facts as follows:

This is an appeal from a judgment rendered against de-
fendants in an action for damages brought by Gertrude E.
Lewis, hereinafter styled plaintiff, against the H. F. Mandler
Company, H. F. Mandler, and L. W. Richardson.

Plaintiff alleged that on March 5, 1913, she was the owner
of certain real estate described by block and lots, and, desir-
ing to effect a trade or sale of said property, engaged defend-
ants to represent her in the consummation of a trade with one
Mangan, whereby the said property was to be conveyed to said
Mangan in consideration of $4,750 and of his conveyance to
her of a lot and premises in the city of Washington known
as the Winchester Apartment House, and for their services
plaintiff agreed to pay them a commission of $350. That
two of her lots, known as the Hall street property, were to be
conveyed by her to Mangan clear of a certain trust deed for
$2,700, payable in monthly instalments of $30. That the
$4,750 cash to be paid by said Mangan was to be paid over
to the District Title Insurance Company and by it applied
in the liquidation of certain charges upon the lots conveyed
by her. That these charges, exclusive of the payment of the

said $2,700 trust, aggregated $3,200. As originally contemplated, $1,000 of said $2,700 trust were to be assumed by the Capital Realty Company and secured by a third trust upon the Winchester Apartment House.

That plaintiff, upon hearing that these charges aggregated $3,200, refused to proceed with the aforesaid sale or exchange, stating that she did not have the money to carry it out. That in order to induce plaintiff to carry out said exchange of properties, the defendants agreed to take care of the $2,700 trust, and accept in lieu thereof a third trust upon said Winchester Apartment House, payable in monthly instalments of $150. That by the terms of said agreement the sum of $700 became payable to plaintiff from the District Title Insurance Company, and the further sum of $1,000 was to be applied toward the satisfaction of an instalment falling due upon the first trust on the said Winchester Apartment.

That relying upon this agreement, plaintiff notified the Title Insurance Company to consummate the exchange, and demanded of the defendants the $700 due her under the said agreement, which she refused, defendants stating that all of the said $4,750 in the hands of the Title Insurance Company had been exhausted, and that no cash had been delivered to them as plaintiff's agent. Defendants further stated that they would not allow the Capital Realty Company to accept said third trust for $2,700, and that the sum of $1,700 in cash has been paid to the Capital Realty Company for its release of the said trust deed on said premises, and she charges that the sum of $1,700 has been appropriated by defendants.

That, by reason of the premises, plaintiff has been reduced to a state of extreme financial stringency, having no available funds and no means of raising any. That said Winchester Apartment House has been advertised for sale by defendants Richardson and S. K. Terry, trustees under a deed of trust, for the nonpayment of an instalment of $30. That plaintiff has been fraudulently forced into a disadvantageous deal whereby the second deed of trust securing the payment of $2,700, payable in monthly instalments of $30, and whose cash dis-

count value was but $1,850, has been paid and released at a cash expenditure by the plaintiff of $2,700, wherefore plaintiff claims damages in the sum of $900.

Defendants pleaded the general issue.

Plaintiff testified that the defendants acted as her agents in the negotiation of a number of transactions prior to this. That Mrs. S. K. Terry was the president of the Capital Realty Company, and her office was in the same building with the defendants. That defendant Mandler was a stockholder and an officer of said company.

She offered in evidence a letter dated February 10, 1913, directed to Goldenberg-Moran Company, and signed by L. F. Mangan, authorizing the following exchange: Will give the Winchester Apartment House, subject to a first trust of $12,000 at 5 per cent due, about April, 1913, and subject to a second trust of $6,000, at 6 per cent, due in three years, and $4,750 in cash, for the properties (describing plaintiff's several lots, one of them subject to $5,000 at 5 per cent and the Hall street property, subject to a first trust of $2,350, at 6 per cent, due in two years, and two other lots in Hall place, subject to a first trust on each of $2,250, at 6 per cent, due in two years, and one lot on South Dakota avenue, Woodridge, District of Columbia, clear of trust, and one lot on Conduit road, clear of trust). This proposition to be accepted at once, and deal closed within fifteen days from date of acceptance. Titles of all the properties to be perfect and sufficient titles. Taxes, interest, rents, etc., to be adjusted to date of settlement. Each party is to furnish at their cost titles to the properties they convey, and also to furnish deeds to the properties they convey. This is witnessed by C. R. Moran and J. D. Free, and is signed accepted by T. L. Lewis. T. L. Lewis is the husband of the plaintiff.

She further testified that the Mandler Company was acting for her in this transaction; that her title papers were taken to the title company by Mr. Richardson; that the contract offered in evidence was actually agreed upon some time in March, around the 1st of March, and that after the papers were submitted to the title company for the consummation of

the exchange, there was not sufficient money to meet all the demands, and witness immediately recalled the deal, went to the Mandler Company, and stated that she would not let the deal go through; that there was not a penny in it for her, and that she was under such a strain from finances at the time that it was impossible. They talked the matter over; witness and her husband with defendants Richardson and Mandler. She refused to let it go through according to that contract. The arrangement then was that defendant Richardson said he would take the $1,700 cash, or a little over; that the property on Hall place was two houses, the two subject to $2,350, the one on Wisconsin avenue was subject to $5,000, and the other two properties were clear; that a $2,700 mortgage which was on the two Hall street houses, the two that had the largest trust on them, was to be put on the Winchester Apartment House; that there was $1,350 each on the two Hall street houses, between the first and second trusts. That the Winchester Apartment House then had a $12,000 first trust, and a $6,000 second trust; that the second trust on the Winchester was coming due in about less than a month after the deal was consummated, and witness was to pay $1,000 on the $12,000 to make that trust $11,000, that is, on the first trust on the Winchester; and witness did not have the money, so she recalled the deal and said she would rather lose all the property than go through like that. "Then they decided that if I would let the deal go ahead, they would give me the $700 in cash out of the $1,000 to meet this trust in the month's time on the Winchester Apartment House." That trust was due about April 7th, in the Riggs Bank, and he was to give witness $700 in cash, and she was to pay $30 a month on the $2,700 which was on the Hall street property. That was to be paid, and in lieu of it witness told him if they would put the whole trust, take the two trusts off and put it all on the Winchester, she would let them collect the rents and, in lieu of the $30 payment, would let them have $150 a month until that was paid. That was all agreed upon. They decided that would be perfectly fair, if witness would let them collect the

rents and have the $1,000 so they could meet the trust, so the building would not be sold, and they would be sure of getting their money. Witness agreed and has never seen a penny of the whole affair since. Asked what became of the trusts of $2,700 on the Hall place property, she replied that a thousand of it was already put on the Winchester. She wanted the whole thing put on the Winchester. They put the thousand on the Winchester and kept $1,700 themselves. They paid off $1,700 of the $2,700 that was on the Hall place property, instead of transferring the trust from the Hall place property to the Winchester as a third trust. The Hall place property was payable only at the rate of $30 a month, and the Winchester Apartment was made subject to a third trust of $1,000. None of the witness's funds were to be applied by these people to the extinguishment of that trust, and witness lost her interest in that property by its being sold at public auction, by L. W. Richardson and S. Kiggins Terry, trustees. That about two days after the notice was payable, they advertised it and put it up for sale. Witness never authorized the payment of $1,711.27 to the Capital Realty Company on the Hall street trusts, and that payment was in violation of witness's instructions to the Mandler Company. That the Hall place property was sold to Mr. Mandler and he still owns it. The transaction went through the title company in violation of witness's instructions, and she now has no interest in either the Winchester Apartment House or the property that she did own.

On cross-examination, she further testified that the Winchester was sold under the third deed of trust; that the trustees under the first trust had not advertised the property for sale until after it was put up for sale under the third trust, and sold, or the sale bought off, in fact. That the instructions which were violated in making the payment to the Capital Realty Company were given orally by witness to Mandler and Richardson; that witness never saw a letter written to the title company by Mandler Company directing them to pay $1,700 to the Capital Realty Company on account of the two trusts on the Hall place property, which letter was exhibited to witness

and offered in evidence. The letter is dated at Washington, District of Columbia, February 18, 1913, and is directed to the District Title Insurance Company, Washington, District of Columbia. It recites the forwarding of two notes for $1,350 each, secured on the Hall place property, which the company was authorized to cancel, and release said lots, upon the following conditions:

One thousand seven hundred dollars cash to the Capital Realty Company, and note for $1,000, payable $30 per month, bearing 6 per cent interest, per annum, payable semi-annually, said note payable to the order of the Capital Realty Company, secured by deed of trust on the Winchester Apartment House, back of a first trust of $10,000 and a second trust of $6,000.

Rent agreements of said apartment house to be assigned to H. F. Mandler Company for collection of rents, together with a letter from the owner of said apartment house authorizing said H. F. Mandler Company to collect said rents until said $1,000 note is fully paid and satisfied.

(Signed) Capital Realty Co.,
By H. F. Mandler, Treas.

Witness then identified her signature to a deed of trust which she offered in evidence, and which deed of trust, bearing date of the 24th of February, 1913, and recorded among the Land Records of the District of Columbia on the 6th of March, was between Gertrude F. Lewis, party of the first part, and Louis W. Richardson and S. Kiggins Terry, parties of the second part, and conveyed the Winchester Apartment House as security, reciting in terms that it was given to secure the payment of an indebtedness owing by plaintiff to the Capital Realty Company, in the sum of $1,000 represented by her one certain promissory note of even date with these presents, payable in instalments of $30 each, one on the 24th day of each month after date, until paid, and bearing interest at 6 per cent per annum, payable on the amount of each instalment due as aforesaid to and on the date of its payment, and

semi-annually on the unpaid balance; it being expressly under-
stood and agreed that during all the time during which any
part of the said indebtedness and the interest thereon · shall
remain unpaid and unsatisfied, the parties of the second part
shall have the privilege of designating the agent or agents who
shall collect the rents for the property hereby conveyed, and
that the said agents shall apply the rentals so collected, after
deducting the usual commission of 5 per cent for collecting
same, to the payment of the instalments of principal and in-
terest on said note, and to the payment of the matters hereby
secured when the same shall become due, and pay the balance
of the amounts so collected, if any, to the party of the first part.

She thereupon further testified that the notes therein de-
scribed, payable in instalments of $30 each, one on the 24th
day of each month, were not the notes that she had just testified
were to be paid off in $150 instalments. "This was the $30
note that was to be paid off, not the $150 note." She does
not remember whether she signed the deed of trust securing
the $150 notes, or whether she signed a note payable in in-
stalments of $150; that the deed of trust just offered in evi-
dence is the only one she signed that she remembers. She
has had little experience in buying and selling real estate. Has
been dealing in real estate and making exchanges for four or
five years. Her husband was in the same business, and they
were acting together in this matter. He was interested in the
property. She did business with some few other real estate
firms during this time besides the Mandler Company. That
the agreement first offered in evidence was signed in Richard-
son's office, not in Moran's office; all the papers she signed were
in Mandler's office at Richardson's desk, and at his request.
That she did not see a statement prepared by the title company
indicating the way in which the money was to be disbursed,
and that the statement was not shown her, and was not read
over by her and her husband. Could not tell when she first
learned that the money was not being disbursed in accordance
with her understanding. It was between the 1st and the 8th
of March somewhere, and in the office of the Mandler Com-

pany, that she first notified them that the money had not been disbursed in accordance with her agreement before the deal was consummated. They were just waiting for the title company to close it, and she had the deal held up. Would not have it closed under those circumstances. Some of the Mandler Company's commission was paid in cash, and she signed a note for part of the commission, but did not know at the time of signing the note that there would be no cash coming to her. They intended to give her the money and take the rest of their commission in the note. She first made complaint about the way the matter had been consummated to Richardson, and did no business with them after that time.

She further testified that when she made complaint to Richardson he said he was very sorry indeed; that he had never hated a transaction so in his life; "that we had done business there, and it had been so satisfactory, and to be held up like that, he said it was a crime." The Winchester Apartment House was sold under the third trust just about a couple of weeks, or probably not that long, prior to the maturity of the first trust for $12,000.

On recross-examination, she further testified that at the time of the sale under the third trust, there was no interest in arrears on the first trust, the interest on that trust not being due until April 7th. The trustees under the third trust advertised quite a while before the trustees under the first trust.

Timothy L. Lewis, a witness for the plaintiff, testified that he was her husband. That he remembered signing the contract on behalf of his wife for the exchange of her properties for the Winchester Apartment House, and identified his signature to the contract offered in evidence. After the execution of that contract, and before the deeds were passed, witness and his wife went to the office of the Mandler Company, and "the agreement was that they were to keep $1,000 to curtail the trust on the apartment house and turn us over the $700." Witness's wife held the transaction up, and Richardson said, "Mrs. Lewis, don't worry yourself, we will fix the transaction

so that you will be all right." And witness's wife replied, "As long as you do that, you can go ahead with the deal." They did not go ahead on that at all; they went just as the first agreement was; "they took everything clean away from us, we did not have a dollar." The trusts on Hall place were payable $30 a month; that we were to put a third trust on the apartment, that was the agreement, in place of $30 a month; "we told them they could collect the rent on the apartment," and we agreed to give them $150 a month on that $2,700. That the Mandler Company were to act as the agents for the collection of the rent on the Winchester, which had six apartments, and the gross monthly rental was about $207. The apartments were rented all the time. There was $1,000 to be paid on the Winchester in about thirty days from the date of the transaction to curtail the first trust, in order that it might be extended for three years at 5 per cent, and the $700 they agreed to turn over to us. "They just kept the whole thing, the $1,000 and the $700 both," and they didn't make any curtail of the $12,000 trust, but they themselves foreclosed the $1,000 trust they put on the Winchester to secure that.

On cross-examination, the witness testified that at the time they were negotiating for the sale or exchange of the Winchester, by which they expected to make a large profit, but there was nothing definite, and if that had gone through under the plans for which they were negotiating, they would have made some five or six thousand dollars. They had some difficulty in inducing the defendants to agree to take the risk of a third trust on the Winchester in exchange for the second trust which they had on the Hall place houses. Witness convinced them that the security on the apartment was better as a third trust than the second trust on the houses. That they were to collect $150 a month on the apartment, and but $30 a month on the houses. Asked if they agreed to that, the witness replied that Richardson agreed to it. Does not know whether "we signed notes to that effect or not." They accepted the proposition, and Richardson told the title company to go

ahead with the deal, and they accepted the whole transaction like that. Had not made those notes yet. The title company was to get hold of the money to be passed in the transaction if they acted right. That witness did not sign the notes for $150 because they had not been made out. Neither witness or his wife signed any notes at all. They signed a third trust for $1,000 on the Winchester, represented by a $1,000 note, not payable in $150 instalments, but in $30 instalments. The agreement to pay $150 a month was never carried out. "We agreed to it." "They are the ones that went back on it." The deal went through, but we didn't know it went through until it went under the first contract. We thought it was going through under the second one. There was just one·$1,000 note payable in $30 instalments that was signed for the third trust on the Winchester Apartment. First found out that $1,700 was paid over to the defendants instead of $700 to be paid over to witness and his wife, when the title company called "us" up and said there was a deficiency in the disbursement of the money, and they then knew all about it; that the contract was not going through as they had agreed. They said there was not enough to pay those commissions due the agents, and sent a note to be signed for the commissions, and witness and his wife signed the note and sent it back to the title company. They then knew that the agreement was not going through in the way they have testified; that Richardson said "let the deal go through and we wlli fix it up, just as we agreed." He said they would keep the thousand dollars until that time came to curtail the note, and would give a check for $1,700. That witness and his wife both saw the letter to the title company instructing them to pay the $1,700 to the Capital Realty Company. They saw it in the offices of the Mandler Company. It was read to them there. It was not shown them at the title company. He saw a statement prepared by the title company showing ho this money as to be disbursed. It as not shown to him at the title company and he and his wife did not go over it together there, but it was two or three days after— about two weeks or ten days, before we got the statement from

the title company. He identified the statement which was offered in evidence, and which shows in detail the charges on each lot to be paid out of the cash fund received.

This shows a payment of the second trust on the Hall street properties, $2,700 less the note secured on the Winchester of $1,000.

Defendants' evidence tended to show a contradiction of the plaintiff's, and that the exchange went through as contemplated.

Upon the conclusion of the testimony the defendants prayed the court to direct a verdict in their favor upon the ground that there was a fatal variance in the plaintiff's pleadings and proof, which motion the court overruled, and exception was taken.

They next requested the court to instruct the jury that even if they could find that the defendants, or either of them, made the agreement and committed the creach threof allged, the plaintiff has shown no evidence that she has suffered substantial damages as a result, and the verdict of the jury must be for nominal damages only, without costs. This was refused, and exception taken.

The court instructed the jury generally that if the plaintiff was entitled to recover at all, she could not recover exceeding $700.

The jury returned a verdict for $700, on which judgment was rendered.

Defendant moved in arrest of judgment because the declaration states no cause of action.

This motion was overruled as well as a motion for a new trial, and defendants have appealed to this court.

*Mr. I. H. Linton* and *Mr. W. C. Sullivan* for the appellants.

*Mr. Charles Poe* for the appellee.

Mr. Chief Justice SHEPARD delivered the opinion of the Court.

The [question on the] special instruction requested by the

defendants is whether there was a fatal variance between the allegations of the declaration and the proof offered in support thereof.

The substance of the case made by the declaration seems to be that by the last agreement of the parties, the defendants were to transfer the $2,700 trust on the Hall street property to the Winchester Apartment House, which agreement, if carried out, would have left a sum of $1,700 in the title company for distribution, $1,000 of which was to be applied to the reduction of the first trust deed on the Winchester Apartment House, and $700 to be paid to the plaintiff, and that this was not carried out by the defendants, and that they refused her the $700.

Plaintiff testified to this preliminary agreement, and her proof shows that she conveyed her property to Mangan and took his conveyance to the Winchester Apartment premises. She introduced proof of the execution of a third deed of trust on the Winchester Apartment House for $1,000, instead of $2,700 as the agreement called for, and that she saw from the statement of the District Title Insurance Company that $1,700 would be paid over to the Capital Realty Company on the Hall street property trust. This, in addition to the costs and charges contemplated in the settlement, consumed the whole of the cash paid by Mangan, and left no surplus of $700 or any other amount.

It seems then that the original contract of exchange with Mangan was carried out as contemplated, and that the second agreement, if made with defendants, was practically abandoned by this last act of giving the third trust deed for $1,000 upon the Winchester Apartment House, instead of $2,700 as plaintiff had previously stipulated; nor is there any evidence that this third trust deed was procured by fraud.

According to this, there was no sum of $700 due to plaintiff, and the proof failed to establish the allegations of the declaration.

The court should have given the instruction asked, and for that reason the judgment is reversed with costs, and the cause remanded for another trial.                    *Reversed.*